## BANK OF AMERICA et al. v. WAGGONER et al.

(Circuit Court of Appeals, Fifth Circuit. January 30, 1906.)

### No. 1,455.

1. CHATTEL MORTGAGES—FORECLOSURE—PRIORITY OF LIEN—EVIDENCE.

In an action to foreclose the lien of a chattel mortgage, which had been wrongfully used by the debtor to secure notes discounted by plaintiff and defendant banks, evidence *held* to sustain a finding that the claim of plaintiff bank to a lien fixed by the mortgage was prior in time, and therefore superior in right to that of defendant bank.

2. SAME—DESCRIPTION—CATTLE.

A chattel mortgage on certain cattle described them as 50 head of registered Hereford cows and heifers, four head of registered Hereford bulls, all located on the mortgagor's farm, about 15 miles from V. in W. county, Tex. A sheriff's return on a writ of sequestration in the proceedings to foreclose the mortgage alleged that the sheriff had taken into his possession the property described, pointed out by the mortgagor as the property described in the mortgage, to wit, 35 head of Hereford cows and heifers, 1 two-year old bull, and 18 head of calves, and a bill of sale taken by defendants described the cattle as 65 head registered Hereford cattle, consisting of cows, calves, heifers, and bulls of all ages, located in the seller's pasture at his home at Doans and Vernon, in W. county, Tex. *Held*, that the mortgage was not void for want of a sufficient description of the cattle.

[Ed. Note.— For cases in point, see vol. 9, Cent. Dig. Chattel Mortgages, § 90.]

3. SAME—REGISTRATION—ACTS OF CLERK.

Where a chattel mortgage securing a negotiable note was duly filed in the office of the clerk as required by Sayles' Civ. St. 1888–89 Tex. art. 3190b, § 2, the rights of an assignee of the note and mortgage could not be affected either by any subsequent act of the mortgagor or mortgagee or by the clerk's failure to make the proper entries in his records or to keep the paper in its proper place.

Appeal from the Circuit Court of the United States for the Northern District of Texas.

J. H. Barwise, Jr., A. L. Matlock, Geo. E. Miller, and F. E. Dycus, for appellants.

W. O. Davis and Sam J. Hunter, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. The National Bank of Commerce brought suit in the state court against J. W. Coffee on a promissory note dated the 5th day of April, 1900, and payable the 5th day of November, 1900, in the sum of $7,500, and on a chattel mortgage given on certain live stock, embracing cattle and horses, to secure

the same, sued out a writ of sequestration, and caused the property to be taken into the custody of the sheriff. The defendant did not replevy, and the court ordered the property sold. Before the sale was made the appellees made affidavit and bond as claimants of the cattle, which were surrendered to them. The proceeds of the sale of the property were deposited in the court. On application of the defendant, the Bank of America of New York was made a party, and on its petition the case was removed into the Circuit Court. Whereupon the pleadings were recast to meet the equity practice, and R. C. Neal, W. T. Waggoner, and Robert Houssels were made parties, and such proceedings were had that the suit came to final hearing, when the court passed its decree giving judgment in favor of the appellants, respectively, against R. C. Neal and J. W. Coffee, for the amounts of the notes held by them, and decreed in favor of the National Bank of Commerce a foreclosure of the chattel mortgage as to all the personal property described in the mortgage, except that which had been released to Waggoner and Houssels on their claimants' affidavit and bond. As to these claimants, the court found that they were innocent purchasers for value without notice of the lien of the chattel mortgage, and decreed in their favor accordingly, in terms not requiring further specification to understand the question which we pass upon on this appeal. The National Bank of Commerce and the Bank of America each separately appealed, and each have submitted assignments of error, the substance of which are that the court erred in adjudging that the appellees were innocent purchasers of the cattle for value without notice of the lien of the chattel mortgage. The Bank of America submits a further assignment, that the court erred in holding that the National Bank of Commerce had a prior and superior right to the proceeds of the property that had been sold.

The proof shows that for a number of years before April 5, 1900, R. C. Neal had been engaged in business at Vernon, in Wilbarger county, Tex., as president and active manager of the Merchants' & Cattlemen's Bank, and as a dealer in Hereford, or "white-faced," cattle. He had also a pasture on Red river, 10 or 15 miles north of Vernon, in Wilbarger county, in which he had cattle and other stock in charge of J. W. Coffee. Before April 5, 1900, the Merchants' & Cattlemen's Bank was reorganized and became the Waggoner National Bank, having a capital stock of $50,000, of which W. T. Waggoner held $10,000, Robert Houssels $3,000, and R. C. Neal over $30,000. Houssels resided in Vernon and was engaged in other business there during all the time of Neal's residence and operations there. Waggoner resided at Decatur, in Wise county, but the extent and nature of his business was such that he was from time to time at Vernon and well acquainted with Neal and with Neal's business activities. In 1900 Neal's pasture embraced a section and a half of land, 960 acres, and immediately adjoining it J. W. Coffee owned a farm on which he resided, having some stock of his own, and extended his care over Neal's pasture and the stock therein. While conditions were thus, Coffee, at the request of Neal, made and delivered to Neal the promis-

sory note and the chattel mortgage on which the Bank of Commerce herein sues. His execution of the mortgage was acknowledged by Coffee before the proper officer, and on April 11, 1900, it was placed in the hands of the clerk of the county court of Wilbarger county and an authenticated copy thereof was then placed on file and kept there by the clerk. On April 24th Neal applied in person to the National Bank of Commerce at Kansas City, Mo., for a loan of $10,000, and offered as collateral certain shares of stock in the Waggoner National Bank of the face value of $4,000, which he represented were worth more than par, and the note of J. W. Coffee (on which this suit was brought), "which he said was perfectly good, and was well secured by chattel mortgage on cattle." Relying on these representations, the bank accepted the collateral tendered and made the loan. In July, 1899, at the request of R. C. Neal, the Bank of America discounted for him a note of J. W. Coffee dated November 3, 1898, for $15,900, due May 3, 1900. It was dated Vernon, Tex., and made payable to the Merchants' & Cattlemen's Bank, and was indorsed by that bank and by R. C. Neal. As collateral security for the payment of this note, Neal gave the bank, at the time the transaction was completed, a mortgage made by the maker of the note, and bearing the same date, in favor of the same payee and covering certain cattle and horses therein described. The proceeds of the discount were sent to R. C. Neal. On April 16, 1900, the bank received from Neal the following letter:

"Vernon, Texas, April 11th, 1900.

"Wm. H. Perkins, Esq., Pt. Bank of America, N. Y.—Dear Sir: My discount of $15,900 will be due in the early part of May, and I want to pay $8,400 and have you carry $7,500 for another six months. The note and mortgage I inclose for your approval. I will also pay the interest on the $7,500.00 from the time the note matures until due. I will say that the cattle in the mortgage are easily worth $10,000.00, to say nothing of the horses. Please let me hear from you, and I trust you will be able to favor me. If this is satisfactory, say how much I shall send you to square the interest and the balance of the $15,000.00. I figure it will be $8,625.00, if note matures May 5th. Thanking you in advance for the favor, I am,

"Yours truly, R. C. Neal."

To which the bank replied:

"New York, April 16th, 1900.

"R. C. Neal, Esq., Vernon, Texas—Dear Sir: We are in receipt of your favor of the 11th instant, with note of J. W. Coffee $7,500 and accompanying collateral, chattel mortgage, J. W. Coffee to yourself. We will, as requested, discount this note on May 6th in part renewal of note $15,900 due at that time. The discount on the $7,500 note from May 6th to maturity, November 8th, 186 days, at six per cent. per annum, will amount to $232.50. Please send us in addition $1.50 to cover the required revenue stamps which you have not affixed to the note.

"Yours respectfully, W. H. Perkins, President."

Thereafter Neal wrote as follows:

"Vernon, Texas, May 3rd, 1900.

"W. H. Perkins, Esq., President, The Bank of America, New York City— Dear Sir: I herewith hand you draft on the National City Bank of New York City for $8,634.00, covering your favor of April 16th.

"Yours very truly, R. C. Neal.

"Enclosure."

To which the bank replied:

"New York, 7th May, 1900.

"R. C. Neal, Esq., Vernon, Texas—Dear Sir: We are to-day discounting note J. W. Coffee $7,500.00, and applying proceeds on note $15,900.00, due this day, which find enclosed, stamped paid. The balance of said note was paid by check $8634.00, received in letter May 3rd, signed by you as president, which we presume was a mistake. Please confirm our action with reference to check $8634.00.

"Yours respectfully,          W. M. Bennett, Cashier, by W. B. Husted."

To which Neal replied:

"Vernon, Texas, May 11th, 1900.

"The Bank of America, New York—Gentlemen: Your favor of the 7th to hand. I hereby confirm your action with regard to check $8634. The latter should have been signed straight R. C. Neal and check of 8634 applied as per your letter.

"Yours very truly,          R. C. Neal."

The evidence shows that the notes held, respectively, by the co-appellants and the chattel mortgage were executed by the defendant J. W. Coffee, and that the notes are identical in terms, and that the chattel mortgage sent to the Bank of America is identical in its terms with the copy on file with the clerk of the county court. To us it seems clear that as between the co-appellants, even if their equities are otherwise equal, the claim of the National Bank of Commerce to the lien fixed by the chattel mortgage is prior in time, and therefore superior in right to the claim of the Bank of America, and that the Circuit Court did not err in so holding.

We do not understand that the appellees attack either the execution of the chattel mortgage or its due registration. They do contend, first, that the animals claimed by them are not sufficiently described in the chattel mortgage to fix a lien on them against subsequent purchasers for value without actual notice of the mortgage; second, that at the time of the giving of the mortgage the mortgagor was not the owner of these cattle, but that R. C. Neal, from whom the appellees bought, was the owner, and that therefore the registration of the mortgage did not charge them with notice or put them on such inquiry as would reasonably bring notice to them. The chattel mortgage made by J. W. Coffee describes the cattle thus:

"50 head of registered Hereford cows and heifers; 4 head of registered Hereford bulls —— all located on my farm about fifteen miles north of Vernon, in Wilbarger county, Texas."

The sheriff's return on the writ of sequestration, so far as it touches these cattle, is as follows:

"Came to hand the 2nd day of November, 1900, and executed the 3rd day of November, 1900, by taking into my possession the following described property, pointed out by J. W. Coffee as the property described within, to wit, —— 35 head of Hereford cows and heifers and 1 two yr. old bull and eighteen head of calves."

In the bill of sale taken by the appellees we find this description:

"65 head of registered Hereford cattle, consisting of cows, calves, heifers and bulls, of all ages, located in my pasture and at my home, at Doans & Vernon, in Wilbarger county, Texas."

On the hearing it was agreed "that reference shall be made to the return of the sheriff for the number of cattle there were." Waggoner testifies that, when he made the purchase, he knew that the cattle he was buying were out on the section of land he had bought from Neal, and that Mr. J. W. Coffee was looking after them, and that about two weeks after he bought them he saw Coffee and asked him if he would hold the cattle for the appellees at the same price, and, being answered "Yes," left them "right there in Coffee's keeping." He had known that Neal had such a lot of cattle; had seen them a few months before he bought. He says that such cattle are not marketable cattle, and testifying about them he designates them by their most conspicuous flesh mark as "white-faced," or "bald-faced," cattle, as do also the witnesses Coffee and Houssels. We think the appellees' first contention is not sound.

The proof shows that from April until September 22, 1900, Neal was speculating in cotton futures and was losing. In the early part of September he approached Waggoner and mentioned lightly that he would be obliged to have some money and asked a loan, but the matter passed off at that time, and a couple of weeks later Neal again approached Waggoner and told him that he needed $25,000 more than he had, and that he could not get it from anybody else, and urged Waggoner to make him the loan. Waggoner said he did not have the money in hand, and they bandied the subject back and forth for several hours immediately preceding the departure of a local train on which Waggoner was to leave Vernon, but Waggoner refused to .do anything, got on the train, and thought he was rid of Neal. Before the train left Neal saw Robert Houssels and asked him to sign a note for $25,000. Houssels said he would not do it; it was too much money. Then Neal said he had made arrangements with Waggoner and that he had to get some money, and that he was going to make a deed to his home and some land and some white-faced cattle, that he had the deed made, and that he was going down to take it to Waggoner, and under that representation Houssels signed the note; the name of the payee then being in blank. Neal got on the leaving train and followed Waggoner to Oklaunion and begged him into signing the note. The note is in words and figures as follows:

"The Waggoner National Bank of Vernon.

"$25,000.00.                                        Vernon, Texas, Sept. 22, 1900.

"Ninety days after date, we, I or either of us promise to pay to the order of National Bank of Commerce, at the Waggoner National Bank, Vernon, Texas, the sum of twenty-five thousand & no/100 dollars, for value received, negotiable and payable without defalcation or discount, with interest at the rate of 10 per cent. per annum from maturity until paid, and if sued upon or placed in the hands of an attorney for collection, I agree to pay all cost of suit, together with 10 per cent. on principal and interest, as attorneys' fees.

"[Signed]                                             R. C. Neal,
                                                     "W. T. Waggoner,
                                                     "Robt. Houssels."

Robert Houssels had signed at Vernon, R. C. Neal had signed before Robert Houssels, and space was left between these signatures for the signature of W. T. Waggoner. W. T. Waggoner, while being examined as a witness, was asked:·

"Q. Do you remember whether you signed that note with Mr. Houssels before or after you got the bill of sale or conveyance? A. They were all handed to me at the same time, and I signed them at the depot in Wichita Falls, and I told him good-bye, and told him I never expected to see him again. Q. Mr. Houssels and Neal had already signed the note before it was presented to you at Wichita Falls? A. Yes, sir. Q. Neal presented to you the note for signature? A. Yes, sir."

Neal told Waggoner that he would get the money on the note from the National Bank of Commerce, and that he was going right straight to New York and "try to win even."

The appellees took a bill of sale of the cattle and conveyance of Neal's homestead in the town of Vernon and of 960 acres of land. Waggoner testifies that the land was worth $2.50 to $3 an acre, and in the estimate he made of the property he valued the residence homestead at not exceeding $5,000. Houssels estimates the land and residence at a value somewhat higher. Houssels made no inquiry as to the title of the property before executing the note, and neither of the appellees made an examination, or caused any to be made, of the records of the county. Two weeks after the papers had passed Waggoner went out to see Coffee and the cattle that were in his charge. He asked Coffee if he had any interest in the cattle and Coffee said that he had not, but the next day Coffee came into town and told Waggoner something about the transaction that occurred in April, and thereupon they went to the clerk's office and after some search found the chattel mortgage. There was no want of intrinsic fairness in the dealings that took place between Coffee and Neal on the 5th of April. They used their own names. The mortgaged property was in existence and was fully worth the amount of $7,500. It was located in the county where the parties resided; had been there for some time before these dealings were had. It remained there until after this litigation began. It cannot be contended, and, as we understand, it is not suggested, that, as between Neal and Coffee and the National Bank of Commerce, the ownership of the property was not, in fact, as described in the chattel mortgage. The purpose of the transaction was to convert an unbankable asset of real value into negotiable securities, in which banks largely deal, and through the aid of such transactions commercial dealings are facilitated. The law in Texas does not require that the sale of cattle shall be evidenced by writing, nor does it expressly or impliedly forbid the making of such accommodation paper as resulted from these dealings between Coffee and Neal. As we read the argument of the distinguished counsel for the appellees, the gravamen of his complaint is that one seeking to purchase the cattle afterwards and making rational and reasonable inquiry as to their ownership, and as to there being any charges on them, would be misled by the apparent possession, and by the manner in which the indexes in the county clerk's office were or should have been kept respecting the registration of the chattel mortgage. These counsel say they use the terms advisedly when insisting that the cattle were "in Neal's exclusive possession." The equally able and distinguished counsel who represent the appellants, whenever any reference to the possession of the cattle is made in their argument or brief, say that

"Coffee was in actual possession of the property." We have recited the facts bearing on that point, so that this difference between counsel becomes immaterial.

As to the misleading indexes in the clerk's office resulting from the shape given to the chattel mortgage, we observe that the Texas state law provides:

"Upon the receipt of such an instrument the clerk shall endorse on the back thereof the time of receiving it, and shall file the same in his office, to be kept there for the inspection of all persons interested; provided that if a copy be presented to the clerk for filing, instead of the original instrument, he shall carefully compare such copy with the original, and the same shall not be filed unless it is a true copy thereof; and a copy can be filed only when the original has been acknowledged." Sayles' Civ. St. 1888–89 Tex. art. 3190b, § 2.

"The county clerk shall keep a book in which shall be entered a minute of all such instruments, which shall be ruled off into separate columns, with heads as follows: Time of reception, name of mortgagor, name of mortgagee or trustee and cestui que trust, date of instrument, amount secured, when due, property mortgaged, and remarks; and the proper entry shall be made under each of such heads. Under the head of property mortgaged it shall be sufficient to enter a general description of the property pledged and the particular place where located, and index shall be kept in the manner as required for other records." Sayles' Civ. St. 1888–89, art. 3190b, § 4

"Each recorder shall make and enter in a well-bound book an index, in alphabetical order, to all books or records wherein deeds, mortgages or other instruments of writing concerning land and tenements are recorded, distinguishing the books and pages in which every such deed or writing is recorded. * * * It shall be a cross index and shall contain the names of the several grantors and grantees in alphabetical order." Rev. St. Tex. 1895, §§ 4608, 4609.

"The law contemplates that either the original or a true copy shall remain in the clerk's office, but it does not charge the mortgagee with the duty of overseeing the clerk. * * * He [the creditor] sued out his attachment on the 5th of January following, and the evidence shows that his attorney knew of the mortgage and hunted for it on that day, but did not ask the clerk for it, which it was his duty to do, and which, if he had done, he would have learned that it was on deposit as a chattel mortgage and had not been noted in the chattel mortgage register, because of the want of time or the negligence of the clerk, but the clerk would have shown him the original, as it was his duty to do." Parker v. Panhandle National Bank (Tex. Civ. App.) 34 S. W. 198.

It appears to us that, whenever the assignee of a negotiable promissory note secured by a chattel mortgage has done all that it is possible for him to do under the law for his protection, his rights are protected, and no subsequent act of the mortgagee or the mortgagor can operate to his injury. The mortgage having been deposited with the clerk for registration, the mortgagee's rights are not affected by the failure of the clerk to make the proper entries or keep the paper in the proper place. Ames Iron Works v. Chinn (Tex. Civ. App.) 38 S. W. 249. If the indexes were kept, as it seems to be required by law that they should be kept, it is difficult to perceive how one with that measure of knowledge necessary to make him fit for the work of examining such records could have been misled by the mere fact that the mortgage was to Neal, instead of being from him. But whether the record was kept strictly in the manner provided by the statute, it appears on reason and authority to be immaterial; the material fact being only

that the mortgage was duly acknowledged and a duly authenticated copy of it was retained by the clerk. It is, however, idle to speculate about how one might or might not have been misled by the condition of these registry books. It is too clear for comment that neither of the appellees ever made or caused to be made an examination of the records before taking the bill of sale from Neal for the cattle.

Counsel for the appellants have cited First National Bank v. National Live Stock Bank (Okl.) 76 Pac. 130–135, and Alexander v. Graves (Neb.) 41 N. W. 290, 13 Am. St. Rep. 501, while the counsel for the appellees have cited the case of Mackey v. Cole, 79 Wis. 426, 48 N. W. 520, 24 Am. St. Rep. 728. We have examined these cases. They all bear somewhat on the question before us, but we prefer to put our decision on the statutory provisions of the laws of the state of Texas and the decisions of the Texas courts. Breneman v. Mayer (Tex. Civ. App.) 58 S. W. 725–733; Kennard v. Mabry, 78 Tex. 151, 14 S. W. 272.

In our opinion the Circuit Court erred in finding and adjudging that the appellees are innocent purchasers for a valuable consideration, not chargeable with notice of the lien of the chattel mortgage.

Therefore, so much of the decree as finds and adjudges in favor of the appellees is reversed, and the case is remanded to the Circuit Court for further action, agreeably to equity and the views herein expressed.