WILLIAM LOEFFEL, Appellant, v. JOHN H. POHLMAN, Respondent.

St. Louis Court of Appeals, January 19, 1892.

1. **Sales:** FALSE PRETENSES : TRANSFER OF TITLE. If the owner of goods is induced by fraud to part with the possession of them without intending to transfer the title to the party thus obtaining them, as where such party falsely impersonates a third person, and thus induces the owner to sell the goods to him in the belief that he is such third person, no sale or transfer of title is effected, and no act of rescission is necessary in order to entitle such owner to reclaim the goods.

2. **Sheriff:** CONVERSION OF GOODS FOUND ON ARRESTED CRIMINAL. If, on the arrest of a criminal, goods belonging to another are found in his possession, and the police take charge thereof, they hold the goods for the true owner, subject to the obligations imposed upon them by the laws relating to the prosecution of criminals. And if the police, after the true owner has notified them of his title and claimed the goods, deliver the goods to the sheriff, he in turn succeeds to the position of the police as such bailee, and he is guilty of a conversion of the goods, if he restores them to the criminal, notwithstanding that he acts in ignorance of such claim and in good faith.

*Appeal from the St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.

REVERSED AND REMANDED.

*Henry Kortjohn,* for appellant.

*Ford Smith,* for respondent.

( 1 ) The pleadings and testimony show both a sale and delivery of the property to Blinker *alias* Walliman. The title passed to him. Before Loeffel is entitled to the property he must rescind the sale and revest the title to the property in himself. Benj. on Sales [Bennett's Ed. 1888] sec. 433; *Cahn v. Reid,* 18 Mo. App. 115, 123, 124, 125, 126; *Donaldson v. Farwell,* 3 Otto, 631. ( 2 ) And such rescission could not take effect until Loeffel notified Blinker *alias* Walliman of his

election to rescind, and placed him *in statu quo* by returning to him anything of value received from him. Benj. on Sales [ Ed. of 1888 ] sec. 443, p. 373 ; *Melton v. Smith*, 65 Mo. 315, 324 ; *Estes v. Reynolds*, 75 Mo. 563, 565 ; *Schultz v. Christman*, 6 Mo. App. 338, 342 ; *Walters v. Miller*, 10 Iowa, 427, 429 ; *Gaty v. Sack*, 19 Mo. App. 470, 478. ( 3 ) Plaintiff is bound by his pleadings and can only recover on the case made by his pleadings. His petition shows that there was a sale and that title passed. He is not entitled to an instruction on the theory that there was no sale and no title passed. *Bell v. Railroad*, 72 Mo. 50, 57. ( 4 ) Pohlman was an innocent party with no notice of plaintiff's claim. If loss has occurred, it has been through the negligence of Loeffel in failing to notify Pohlman of his claim to the property. And Loeffel must bear the loss. Benj. on Sales [ Bennett's Ed.] p. 375.

THOMPSON, J.—This action was brought before a justice of the peace against the defendant, as sheriff of the city of St. Louis, for the conversion of a watch, chain and gold ring belonging to the plaintiff. The action was brought on the theory, that there had been a *sale* of the property by the plaintiff to one Blinkman, or Blinker, *alias* Walliman ; that the vendee had been arrested on a criminal charge with the goods in his possession by the police of the city of St. Louis ; that the plaintiff had *rescinded the sale* and demanded of the police officers the return of the goods; but that they had delivered them, without value, to the defendant to hold under color of his office ; and that he had refused to deliver them to the plaintiff. This will more clearly appear from the plaintiff's statement, which is in the following language :   " Plaintiff states that heretofore, to-wit, on or about the twenty-fourth day of July, 1889, he was the owner and in the possession of the following described personal property, to-wit, one double case gold watch, number 22452, one gold chain and one solid

gold ring set with two stones, all of the value of $93.;
that on said day plaintiff sold said property on credit to
one Blinkman, *alias* Blinker, *alias* Walliman, and
delivered the same to him ; that, prior to and at the
time of said sale, said Blinkman made certain statements
and representations to plaintiff in order to induce
plaintiff to sell him said property ; that said statements
so made were material to said sale; that plaintiff
believed them to be true and relied upon them, and
that, believing said statements to be true and relying
upon them, plaintiff sold and delivered said property to
said Blinkman on credit as aforesaid ; that shortly
afterwards plaintiff discovered that said statements were
untrue, false and fraudulent in fact, and known to be
so by said Blinkman at the time he made them to
plaintiff ; that shortly afterwards said Blinkman was
arrested and taken in custody by a police officer of the
city of St. Louis, and said property was found upon
said Blinkman, and that the same was taken from him
and taken in charge of by an officer of the police
department ; that, immediately after the discovery of
the fraud practiced upon him by said Blinkman, plain-
tiff rescinded said contract of sale of said property to
Blinkman, and called upon the police officer, then having
the charge and custody of said property and notified
him then and there that he, plaintiff, had rescinded
said contract of sale, and then and there demanded of
said officer the return and delivery of said goods to him,
plaintiff ; that said property was not delivered to
plaintiff, but that delivery thereof was refused ; that
afterwards, to-wit, on July 26, 1889, the defendant,
John H. Pohlman, under color of his office as sheriff of
the city of St. Louis, demanded the delivery to him of
said property, and that the same was, without value,
delivered to him by an officer of said police department ;
that said property was taken possession of by said
defendant and remained in his possession for a long
time ; that, upon taking possession of said goods as

aforesaid, it became the duty of said defendant to safely keep for, and deliver the same to, plaintiff on demand; that afterwards plaintiff demanded the delivery to him of said goods of said defendant, which was refused; that defendant has not delivered said property to plaintiff, although often asked to do so, but has utterly neglected and refused to do so; that, by reason of the premises, and by the refusal of the defendant to deliver the said property to plaintiff, the same has been wholly lost to plaintiff, to his damage in the said sum of $93, for which sum he asked judgment with his costs."

The case was tried in the circuit court, and there was a verdict and judgment for the defendant, and the plaintiff appeals. At the trial it appeared, by uncontradicted evidence, that one Blinker, the person named in the plaintiff's statement under various *aliases*, stole a certificate of deposit issued by the International Bank of St. Louis to one Walliman, and went to the plaintiff who was a dealer in watches and jewelry in St. Louis, and represented that he was Walliman, the person named in the certificate; stated that he desired to purchase the goods in question, but that he had not the money with him, but would draw it from his employer in about ten days, and that he would leave the certificate of deposit with him as security for the payment of the purchase money; that the plaintiff, believing this statement, received the certificate of deposit and delivered the goods to Blinker, together with a bill of sale of them; that the plaintiff immediately thereafter sent his son with the certificate of deposit to the International Bank to inquire whether it was all right; that the bank immediately impounded the certificate on the ground that it had been stolen from the true owner; that the bank afterwards restored it to Walliman, the true owner, and paid it; that Blinker was shortly after, and on the same day of the transaction, arrested by the police of the city of St Louis and taken to the Central police station; that the goods in controversy were found

on his person together with a bill of sale of them; that the police, seeing the name of the plaintiff on the bill of sale, sent one of the police officers to the plaintiff's place of business with the request that the plaintiff accompany the officer to the police station, which the plaintiff did; that the plaintiff, on arriving at the police station, identified the goods as his, explained to the police how Blinker had obtained them from him, and demanded of the police officer in charge of them that they be returned to him; that the officer in charge declined to accede to this demand, on the ground that they would be needed as evidence in the criminal prosecution of Blinker; that thereupon the plaintiff left them in the custody of the police officer; that the police officer, in accordance with the practice of the police department in such cases, afterwards turned them over to the defendant as sheriff of the city of St. Louis, together with the prisoner Blinker; that the plaintiff thereafter appeared in the court of criminal correction (which court acts as an examining magistrate) as a witness against Blinker, and again before the grand jury of the criminal court; that such proceedings were had against Blinker that he pleaded guilty in the criminal court to an indictment, charging him with forging the name of Walliman upon another like certificate of deposit for the sum of $100, and was sentenced to undergo a term of two years' imprisonment in the penitentiary; that, after he had been thus sentenced, he demanded of the sheriff, through the jailor, the return of these goods to him; that the sheriff's deputy who had them in charge inquired of the prosecuting attorney whether the demand should be complied with, and that the prosecuting attorney sent word that it might; and that the goods were thereupon delivered by the defendant's deputy to the jailer for the prisoner, who was about to be started for the penitentiary to undergo his sentence.

Some other facts deserve to be stated, as bearing upon the question whether there had been a rescission

Loeffel v. Pohlman.

of the supposed contract of sale by anything which took place between the plaintiff and the prisoner. Upon this point it appeared that the plaintiff, when he went with the police officer to the police station, as already stated, was taken into the police prison to see the prisoner, in the presence of the police officer, and that the prisoner begged him not to prosecute, saying that the plaintiff would get his goods back, and that the plaintiff replied in substance that whether he would prosecute him was a question to be determined by the officers of the law, and that he would take his property back. The plaintiff's testimony on the former trial was, however, put in evidence by the defendant showing that he then testified that he did not tell the thief that he rescinded the sale; that he tried to get his property back, but not from the thief, because he did not have it any more; and that all that the plaintiff said to him was that it was a nice fraud that he had perpetrated. The jury would have been justified in finding, on the plaintiff's evidence taken together, that the plaintiff had never notified Blinker that the plaintiff formally rescinded the sale; and, as we shall see, this was probably the theory on which the jury found for the defendant.

It should further be stated that the police made the following entries in a record book kept by them:

| PROPERTY. | NAME. | CHARGE. | OFFICER. | WITNESS. | B. C. | DIST. | DISP. |
|---|---|---|---|---|---|---|---|
| $1.55, chain, keys, | William | Obtaining goods | Burk | Alfred Berkey | C | C | |
| Mem. book, letters, | Blinker alias | under false | and Rife | 613 Pine | | | |
| 1 papers | Aug. Walhimer | pretenses | | Aug. Walliman | | | |
| (Pawn ticket Evid.) | Same | Grand Larceny | Same | 4755 Virginia ave. | C | C | |
| and | | | | | | | |
| Gold Watch and | | | | | | | ' |
| Chain and | Same | Same | Same | William Loeffel | C | C | |
| Set—evidence | | | | 1224 S. B'way | | | |

Loeffel v. Pohlman.

It further seems that when the police turned the goods, together with the custody of the prisoner, over to the defendant as sheriff, they failed to advise him that the goods in controversy had been obtained by the prisoner from the plaintiff under false pretenses, and that plaintiff had demanded their return. It should further be stated that the date, on which the goods were obtained by the prisoner from the plaintiff under the false pretenses, was the twenty-third of July, 1889 ; that the date, on which they were turned over to the sheriff by the police, was the twenty-sixth of the same month ; and that the plaintiff never made another demand of them from the sheriff, and never notified the sheriff of his rights until the twelfth of the following November, four days after they had been turned over to the jailer for the prisoner.

Upon substantially this state of facts the court instructed the jury, at the request of the plaintiff, that the fact that the circuit attorney authorized the delivery of the property to the jailer on the order of the prisoner was no defense to the action.

The court refused to give two instructions, as requested by the plaintiff, but did give them of its own motion and over the objection of plaintiff, after interlining them by inserting the words shown in italics below.

"1.   If the jury believe from the evidence that one William Blinkman did, on or about the twenty-third day of July, A. D. 1889, induce plaintiff to sell him on credit one gold watch, one gold chain and one set ring, by falsely presenting to the plaintiff that his name was August Walliman, and that he was the owner of the certificate of deposit issued by the International Bank of St. Louis, offered in evidence, and that the plaintiff upon the faith of said representations delivered to said William Blinkman said goods upon the delivery to him of said certificate of deposit as security for the purchase price thereof ; and if the jury further find that

said representations were false and that said certificate of deposit was the property of August Walliman, a person other than the one to whom plaintiff sold said goods, and that plaintiff never received any pay for said goods, then the plaintiff had a right to rescind said sale so long as the goods were in the hands of said William Blinkman, or any other person who received them from him without paying him any value therefor.

"And if the jury find the facts to be as above set out, and if they further find that shortly thereafter the said William Blinkman was arrested on a criminal charge, and the property obtained by him of the plaintiff was found in his possession and taken charge of by the officers in charge of the police station, and that, while the property was in the possession of the police, the plaintiff called at the police station and identified the said property as his, and *made known to said Blinkman his intention to reclaim and take back said property, and determined to then rescind and avoid said sale,*" and related to the officers in charge of the station all the facts as to the manner in which he had been induced to part with the possession thereof, and demanded the return of the same to him, then from that moment the title of said property became again vested in plaintiff; and if the jury further find that thereafter the said property was by the police department delivered to defendant or his deputies, as sheriff of the city of St. Louis, and was by him or his deputy delivered to anybody but plaintiff, or the officers from whom it was received, and that the same was never received by plaintiff, then they must find for plaintiff, whether the defendant or his deputy knew of plaintiff's ownership of said property or not.

"2. If the jury find from the evidence that the person who obtained the goods, for the value of which this action is brought, from plaintiff was not August Walliman, but that his name was William Blinkman, and that the certificate of deposit mentioned in instruction,

numbered 1, was not the property of said William Blinkman, but was retained by the International Bank, and returned to the real owner, August Walliman, then plaintiff was not bound to deliver said certificate of deposit to said Blinkman in order to rescind the sale, nor was it necessary that plaintiff should state in so many words that he desired to rescind the same ; but any acts or words of plaintiff, which indicated *to said Blinkman and to the person in possession of said property* that he considered the goods his and desired to take possession of the same, were as effectual to rescind the sale and revest the title of the goods in him, as any set words would have been."

The court then, over the objection of the plaintiff, gave the following instruction at the request of the defendant : " The court instructs the jury that, even if they find from the evidence that the plaintiff was induced to sell the property mentioned in his petition to Blinker, *alias* Walliman, by the fraud of said Blinker, *alias* Walliman, yet plaintiff cannot recover the value of said property from defendant unless he has rescinded said sale ; and the court further instructs the jury that the rescission of a sale for fraud takes effect from the date that the party desiring to rescind the sale notified or makes known to the other party of his election to rescind the same ; and if the jury find from evidence that plaintiff did not notify or make known to Blinker, *alias* Walliman, before defendant parted with the possession of the property mentioned in the plaintiff's petition, that he elected to rescind the sale thereof, then the jury must find their verdict for the defendant."

" The court instructs the jury that the burden rests upon plaintiff of proving that he rescinded the sale absolutely ; and, unless he has proved to the satisfaction of the jury that he did so rescind said sale, then the jury must find their verdict for the defendant."

It is thus seen that the case is made to turn upon the inquiry, whether the plaintiff actually notified Blinker or Blinkman that he elected to rescind the sale and to reclaim his property.   It is recalled that the goods were obtained by Blinkman from the plaintiff by the use of a false token, and with a certificate of deposit which he had stolen from the real owner, and that he obtained them by representing to the plaintiff that he was the person mentioned therein.   This was obtaining goods under false pretenses within the meaning of the criminal statute on that subject.  It is also an admissible inference from the evidence that, when the plaintiff delivered the goods to Blinker on the security of this certificate of deposit, he supposed he was delivering them to Walliman, the person mentioned in the certificate,—a person having presumably the means of paying for them, else he would not have $700 to his credit in a solvent bank.   On this evidence the goods were not obtained by a contract of sale at all, but were obtained by a crime.

Mr. Benjamin, the authority of whose work on the law of sales is invoked by counsel for both parties, lays down the law as follows, after referring to certain leading English cases:

" By the rules established in these cases, whenever goods are obtained from their owner by fraud, we must distinguish whether the facts show a *sale* to the party guilty of the fraud, or a mere delivery of the goods into his possession, induced by fraudulent devices on his part.   In other words, we must ask whether the owner intended to transfer both the property in, and the possession of, the goods to the person guilty of the fraud, or to deliver nothing more than the mere possession. In the former case there is a contract of sale, however fraudulent the device, and the property passes ; but not in the latter case."   Benj. Sales [ Last Ed. ] sec. 433.

This expression of doctrine clearly fits the facts of the present case, as disclosed in the plaintiff's evidence,

which is not contradicted. According to that evidence the plaintiff made no contract of sale with Blinker, and never intended to deliver the goods *to Blinker;* but he supposed that he was making a contract of sale with Walliman, and that he was delivering goods to Walliman. It was, therefore, to use the above language, "a mere delivery of the goods *into his possession,* induced by fraudulent devices on his part."

That such is the law of England is shown by several cases. In *Higgons v. Burton,* 26 L. J. Exch. 342, a discharged clerk of one of the plaintiff's customers fraudulently obtained from the plaintiff certain goods in the name and as being for the account of the customer, and sent them at once to the defendant, an auctioneer, for sale. It was held that this was no sale, but merely an obtaining of goods under false pretenses, and that no property passed, and that the defendant was liable in trover. The reason was that the plaintiff never intended to make a sale or to deliver possession *to the clerk,* but to the customer, and hence the clerk acquired no title which he could transfer to the auctioneer.

In *Hardman v. Booth,* 1 Hurl. & C. 803, the plaintiff went to the premises of Gandell & Co., a firm not previously known to him, but of high credit, to make a sale of goods, and was there received by Edward Gandell, a clerk, who passed himself off as a member of the firm, and ordered goods, which were supplied by the plaintiff, but which Edward Gandell sent to the premises of Gandell & Tood in which he was a partner. The plaintiff knew nothing of this last named, but thought he was selling to Gandell & Co. The goods were pledged by Gandell & Tood with the defendant, an auctioneer, who made *bona fide* advances upon them. The plaintiff recovered them from the auctioneer in trover,— all the judges concurring that there had been *no contract,* that the property had not passed out of the

plaintiff, and that the defendant was hence liable for the conversion.

In *Cundy v. Lindsay*, 3 App. Cas. 459 (affirming s. c., 2 Q. B. Div. 96), it appeared that a person named Alfred Blenkarn had hired a room in a house looking into Wood street, Cheapside, and from there had written to the plaintiffs, who were manufacturers, proposing to purchase goods of them. The letters were headed, "37 Wood street, Cheapside," and the signature "Blenkarn & Co." was written so as to resemble the name "Blenkiron & Co." There was a firm of good repute, who carried on business at 123 Wood street under the style of "W. Blenkiron & Son." The plaintiffs, who were aware of the reputation of the firm of W. Blenkiron & Son, but did not know the number of their house of business, sent the goods addressed to "Messrs. Blenkiron & Co., 37 Wood street, Cheapside." Blenkarn sold some of the goods thus fraudulently obtained to the defendants, who were *bona fide* purchasers for value, and who resold them in the ordinary course of business. Blenkarn was afterwards convicted of the fraud. In an action for the conversion of the goods, it was held by the house of lords, affirming the decision of the court of appeal that, as the plaintiffs had no knowledge of, and never intended to deal with, Blenkarn, no contract of sale had ever existed between them ; that the only persons with whom they had intended to deal were the well-known firm of Blenkiron & Co. ; that the property in the goods, therefore, remained in the plaintiffs, and the defendants were liable for their value.

The American authority is the same way. In a case in Pennsylvania, J. S., who pretended to be the agent of B. & Co., called upon D. and contracted with him for wool to be consigned to B. & Co. at Pittsburgh. He also called upon B. & Co., and pretended to be the son of D., and so contracted a sale for the wool. The

wool was shipped by D. to B. & Co., but was received by J. S. who delivered it to B. & Co., receiving the value of it. It was held that the title of D was not divested, and that B. & Co. were liable to him for the wool or its value. *Barker v. Dinsmore*, 72 Pa. St. 427; s. c., 13 Am. Rep. 697.

In a case in Massachusetts, A. falsely representing himself to be a member of a firm, bought in the name of the firm goods from B. who sent them by a carrier to the firm. On the refusal of the firm to receive them, A. sold them to C. to whom they were delivered by the carrier at A.'s request. It was held that no title to the goods had passed to A., and that B. could, therefore, maintain an action for their conversion against C., although he had purchased them of A. for value and in good faith. *Moody v. Blake*, 117 Mass. 23, s. c., 19 Am. Rep. 394. See also *Dean v. Yates*, 22 Ohio St. 388.

These, and other decisions we could have cited, justify the following statement of legal doctrine by Mr. Freeman, the editor of the American Decisions, in a learned note on this subject (33 Am. Dec. 702): "There can be no question that, where the owner of goods is induced by fraud to part with the possession without intending to transfer the title to the party so obtaining them, he may, on discovering the fraud, reclaim them into whosoever's hands they may have come. The property cannot pass where it was not intended to pass, and the party obtaining the goods, never having had the title, cannot transfer title to another. And the fact that the owner intended to part with the title does not affect the nature of the transaction, unless he also intended that the party fraudulently obtaining the goods should receive the title. A common case is where one obtains goods by falsely and fraudulently pretending or leading the owner to believe that he is making the purchase as the agent of another party, or a member of a certain firm. There is, it is true, an intent to sell and to transfer the title as well as the possession, but there is

no purpose to vest any property in the party who receives the goods; and, on the other hand, the party to whom the vendor intended to sell never intended to purchase. Therefore, there is no meeting of minds, and no sale or change of title, and the vendor may reclaim the property, either from the party fraudulently getting the possession, or from anyone receiving it from him, with or without notice of the fraud."

It is plain from these authorities that on the theory of the plaintiff's evidence no act of rescission was necessary on the part of the plaintiff at all, but that he had the right to reclaim his goods wherever he might find them, even in the hands of an innocent purchaser from the criminal,—just as the owner of a stolen chattel may reclaim in whose hands soever he may find it.

The instructions on which the court put this case to the jury have the effect of holding that, where the officers of the law find the goods on the person of the criminal who has obtained them by an act amounting in law to the crime of obtaining goods under false pretenses (which is a species of statutory larceny), and take them into their custody,—not under any contract with the criminal, but *in invitum*, so far as he is concerned, to hold them for the purposes of the law, and for the benefit of the real owner, such owner cannot charge the officers of the law with responsibility as his bailees, in respect of them, by notifying them distinctly of the circumstances under which they were obtained from him and demanding their return to him.

That such cannot be the law, will be apparent on a little reflection. Suppose that goods are obtained under statutory false pretenses and the criminal drops them in his flight, and they come into the hands of the officers of the law or of others,—is it to be supposed that the real owner cannot reclaim them, unless he can catch the absconding criminal and notify him that he rescinds the supposed contract of sale? Must one catch the escaping thief and serve this notice upon him upon

peril of losing his goods if he does not? The thief cannot make the police officers his bailees in respect of goods, for the thief cannot create a bailment in stolen goods. Nor did Blinkman attempt to do so in this case. The goods were not delivered by him to the police officers under a contract by which they agreed to hold them for him as his bailee ; but they took them from him by force, as officers of the law executing the criminal law, and held them for the real owner under the obligations of the law. The real owner might have recovered them from them in an action of replevin without joining the criminal as defendant. And he could, for the same reason, by notifying them of his rights and demanding that the goods be restored to him, charge them with responsibility for them as his bailee, subject, of course, to their public obligations under the criminal laws.

Another consideration will make it appear that it cannot be allowed that the owner is bound to notify the criminal of his intention to rescind the contract.. There cannot be a rescission by the vendor of a merely voidable contract of sale without restoring what the purchaser has received under the contract, and otherwise putting him *in statu quo*. *Thurston v. Blanchard*, 22 Pick. ( Mass.) 18 ; s. c., 33 Am. Dec. 700. But where, in a case like the present, the possession of the goods has been obtained by the deposit of a stolen security, which the vendor has been obliged to surrender to the real owner of it, how can the criminal be put *in statu quo*, which in its application to the evidence in this case would mean that, in order to the rescission of the supposed contract of sale, it was necessary for the plaintiff to restore to the thief the stolen certificate of deposit, by the pledge of which the thief obtained the goods from the plaintiff ; in other words, that the plaintiff could not undo the criminal act and get back his own goods unless he should be willing to assist the thief in committing a larceny of another man's property?

These considerations show the absurdity of attempting to apply the rule of law relating to *contracts* to cases which are merely cases of *crime*.

The plaintiff has, however, embarrassed the case by bringing his action on the theory of a supposed contract of sale, which it was necessary for a plaintiff to rescind, and by claiming that a rescission had been effected. Notwithstanding this, the theory that there could only be a rescission, under the circumstances disclosed by the evidence, by a notification of rescission to the criminal is such a wide departure from the true conception of the law that we must hold that it was error, and reverse the judgment and remand the cause. The plaintiff should be allowed to amend his statement, so as, instead of charging a sale and a rescission, to charge that the goods were obtained from him by Blinker under false pretenses, if he is so advised.

The true theory of this case, on the facts disclosed by this record, is that the title to the goods never passed from the plaintiff to *Blinker*; that no formal rescission of any supposed contract of sale was necessary, either by notifying Blinker or otherwise, to enable the plaintiff to reclaim his goods wherever he might find them; that, when he notified the police of his rights in respect of the goods and put them in possession of full information as to the facts, they became his bailees in respect of them, subject to the obligations imposed upon them by the laws relating to the prosecution of criminals; that when, without value, they turned the goods together with the custody of the prisoner over to the sheriff, they transferred the bailment to him; that, subject to whatever right he may have had under the criminal law to retain them to be used against the prisoner, he was bound to restore them to the plaintiff; that in his custody of them he was subject to the general rule of law that the bailee is bound to know his bailor; and that when he turned

the goods over to the thief, thus assisting him to commit a second larceny of them, he was guilty of a conversion and became answerable to the plaintiff in damages.

Touching some of the views herein expressed, there is a diversity of opinion between the judges of this court, although all are supported by a majority of the judges. But all the judges are of opinion that the verdict, even under the instructions as amended, is so clearly opposed to the uncontroverted evidence as to show that the jury must have misconceived the instructions and that their verdict is the result of a mistake.

The judgment of the circuit court will be reversed and the cause remanded. All the judges concur in this result.